IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


FLOYD BARBER, ET AL.,

      Plaintiffs,

v.                              //   CIVIL ACTION NOS. 1:13CV33 –
                                                    1:13CV100
                                        (Judge Keeley)


MAGNUM LAND SERVICES, LLC,
ET AL.,

      Defendants.

and

RICHARD BELL, ET AL.,

      Plaintiffs,


v.                              //   CIVIL ACTION NOS. 1:13CV113 –
                                                    1:13CV115
                                        (Judge Keeley)


MAGNUM LAND SERVICES, LLC,
ET AL.,

      Defendants.


MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
[CASE NOS. 1:13CV33-1:13CV100, DKT. NOS. 109, 111, 113]
[CASE NOS. 1:13CV113-1:13CV115, DKT. NOS. 32, 34, 36]

Pending before the Court are three motions for summary
judgment, one filed by each of the three defendants, Magnum Land
Services, LLC ("Magnum"), Belmont Resources, LLC ("Belmont"), and
Enerplus Resources (USA) Corporation ("Enerplus"). For the reasons

discussed in this Memorandum Opinion, the Court **GRANTS** the defendants' motions.

## I. BACKGROUND

This case involves the mineral rights underlying approximately 8000 acres of land located in Preston County, West Virginia. Because the mineral rights had not been severed from the surface rights, the 129 individuals who owned or co-owned the parcels comprising the total acreage likewise owned or co-owned the underlying mineral rights. Between 2007 and 2008, those individuals leased their mineral rights to Magnum, resulting in seventy-six individual leases. The transactions between the lessors and Magnum, as well as the resulting leases now held by Enerplus, are the subjects of this dispute. On summary judgment, the Court must determine if genuine issues of material fact exist regarding (i) whether Magnum fraudulently induced the lessors to execute the leases, and (ii) whether the lessors are entitled to rescission of the leases based on unconscionability.

The Marcellus Shale, which runs through the Appalachian Basin, is one of the largest sources of natural gas in the United States. Although the energy industry has long been aware of pockets of gas within the formation, extraction was impracticable and non-economical until the early 2000s. During that period, companies developed cost-effective means of collecting and producing the

natural gas -- to include hydraulic fracturing -- and quickly realized the potential for enormous profits.[1]

As with all rapidly emerging industries, however, information about the growth potential remained tightly controlled by the companies that intended to capitalize on their insight. Of course, the extent of their profits depended largely on the perceived value of the rights to the natural gas. The owners of those rights were, oftentimes, rural landowners in Appalachia with limited knowledge of the oil and gas industry. It is within this context that the events giving rise to these cases occurred.

## A.   Factual

In 2007, Edward Walker ("Walker"), a Michigan businessman with experience in the oil and gas industry, formed Belmont for the purpose of oil and gas exploration, specifically, the acquisition of oil and gas leaseholds. (Dkt. No. 115-2 at 6-7).[2] Based on his experience, he was keenly aware of the Marcellus natural gas play in Appalachia. He was also familiar with other players in the industry, including Magnum, which performed "basic land work," such as "title, takeoff mapping, leasing, leasing activities, [and] right-of-ways." Id. at 25.

---

[1] Until 2010, total natural gas production from the Marcellus Shale did not top 2 billion cubic feet per day. By July 2014, companies were producing more than 15 billion cubic feet per day. See Marcellus Region Production Continues Growth, U.S. Energy Information Administration (Aug. 5, 2014), http://www.eia.gov/todayinenergy/detail.cfm?id=17411&src=email.

[2] Unless otherwise noted, all citations to the record refer to docket entries in case number 1:13CV33.

Around the same time he formed his new company, Walker contacted Magnum with the goal of "[p]ut[ting] together acreage" in Preston County; he asked Magnum to perform the title work and buy the leases. Id. at 27. Belmont would front the money for the leases, and Magnum would execute them in its name and eventually assign them to Belmont. Id. Belmont authorized Magnum to pay owners twenty-five-dollar bonus payments per mineral net acre[3] with a one-eighth royalty on all gas extracted from their acreage. Id. at 38. Terence Goodell ("Goodell"), the founder of Magnum, would receive a five percent stake in Belmont, a one percent overriding royalty in the lease profits, fifty dollars per landman for every day of work, and five dollars per acre with good title. Id. at 31-36.

Throughout 2007 and 2008, Magnum acquired leases covering the rights to 7562.63 mineral net acres in Preston County.[4] Id. at 57. Per their agreement, Magnum assigned the leases to Belmont in 2010. That same year, Belmont sold its interest in the leases to Enerplus, realizing a gross profit of about $1666 per acre. Id. at 20.

Shortly after the landowners signed leases with Magnum, word spread that residents of surrounding counties were signing leases

---

[3] Ten of the lessors received bonus payments in excess of twenty-five dollars per acre. (Dkt. No. 109-1 at 6-7).

[4] The majority of the leases will expire in 2017. (Dkt. No. 109-1 at 6-7).

with substantially higher bonus payments. (Dkt. No. 115-3 at 115).
For example, David Colebank leased sixty-one mineral net acres to
Magnum in August 2007 for twenty-five dollars per acre. (Dkt. No.
109-1 at 6). He later testified that, in the fall of that year, he
discovered that family members in neighboring Tucker County had
leased their mineral rights for upwards of two-thousand dollars per
acre. (Dkt. No. 109-1 at 84-85).

After discussions with one another about their negotiations
with Magnum's landmen, the Preston County lessors discovered a
common theme. In their sales pitches, the landmen had advised the
lessors that oil and gas companies could still collect gas under
non-leased acreage by drilling wells on neighboring properties.

In 2008, several of the lessors met with counsel to discuss
their leases and the representations made by the Magnum landmen.
As a result of that meeting, their attorney sent a letter to
counsel for Magnum, explaining the following:

> I am writing on behalf of several Preston County, West
> Virginia clients. They all leased their oil and gas
> rights to Magnum in the summer of 2007.
>
> Unfortunately, almost all of my clients were induced to
> sign the leases, to their detriment, as a result of
> inaccurate representations made by Magnum employees or
> agents. Moreover, the "bonus" payment and royalty
> percentages that my clients received are very low
> compared to subsequent payments that Magnum made to
> Preston County landowners.

(Dkt. No. 109-1 at 8). Days later, the attorney sent Magnum
another letter, stating: "Most of my clients . . . were paid

embarrassing low amounts for their valuable oil and gas rights after being threatened with the loss of their natural gas if they did not sign the leases." Id. at 9.

**B.    Procedural**

In November 2012, the lessors sued the defendants in the Circuit Court of Preston County, West Virginia, alleging nine counts. The circuit court grouped related plaintiffs and divided the case into seventy-one separate cases. The defendants then removed the cases to this Court, invoking its mass action jurisdiction. The Court subsequently dismissed six of the plaintiffs' claims, including their claim for unconscionability.[5] Remaining are the plaintiffs' claims for (i) fraud in the inducement, (ii) civil conspiracy between Magnum and Belmont, and (iii) a declaration that the leases be rescinded due to unconscionability.

On July 3, 2014, each of the three defendants moved for summary judgment on the remaining claims. They argue that the evidence does not support a prima facie claim for fraudulent inducement, and that the claim is time-barred by the applicable statute of limitations. They contend that, without an underlying

---

[5] Notably, the Court never addressed the merits of the plaintiffs' claim that the leases are unconscionable. Rather, the Court determined that West Virginia law does not permit a stand-alone cause of action for unconscionability. (Case No. 1:13CV113, Dkt. No. 25). In any event, the issue of unconscionability is addressed below in the context of the plaintiffs' claim for declaratory relief.

tort claim, the civil conspiracy claim also should fail.  Finally, the defendants urge the Court to reject the plaintiffs' declaratory claim for rescission of the leases because such a claim is time-barred by laches, and because the leases are not unconscionable as a matter of law.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a), (c)(1)(A).  When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party.  <u>Providence Square Assocs., L.L.C. v. G.D.F., Inc.</u>, 211 F.3d 846, 850 (4th Cir. 2000).  The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party has made the necessary showing, the nonmoving party "must set forth specific

facts showing that there is a genuine issue for trial." <u>Liberty Lobby</u>, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. <u>Id.</u> at 248–52.

## III. DISCUSSION

### A.    Fraud in the Inducement

The plaintiffs allege the following in support of their claim for fraud in the inducement:

> 112. The Defendant [sic] Landmen came to the Plaintiffs' residence[s] and fraudulently induced them to sign the above referenced leases for inadequate consideration based on false and fraudulent representations and purposely and with a common scheme with all Defendants. . . .
>
> 113. That among other false and fraudulent misrepresentations, Defendant [sic] Landmen stated to Plaintiffs that <u>if they did not execute the proffered leases, the Defendants would be able to extract their gas from under their land and Plaintiffs would receive no consideration therefrom</u>.

(Dkt. No. 1-1 at 24) (emphasis added). The plaintiffs seek monetary relief in the form of compensatory and punitive damages. <u>Id.</u> at 25.

Importantly, these allegations are limited to the actions of Magnum and Belmont, not Enerplus. Thus, even though the caption underneath Count IV reads "(ALL DEFENDANTS)," a dearth of allegations sustaining that claim against Enerplus provides a basis

on which to grant Enerplus summary judgment as to the plaintiffs'
claim for fraud in the inducement.

This leaves a claim for fraud in the inducement against Magnum
and Belmont.  To sustain a fraud claim under West Virginia law, a
plaintiff must prove three elements by clear and convincing
evidence:

> (1) that the act claimed to be fraudulent was the act of
> the defendant or induced by him; (2) that it was material
> and false; that plaintiff relied upon it and was
> justified under the circumstances in relying upon it; and
> (3) that he was damaged because he relied upon it.

Trafalgar House Const., Inc. v. ZMM, Inc., 567 S.E.2d 294, 300 (W.
Va. 2002); see also Tri-State Asphalt Prods., Inc. v. McDonough
Co., 391 S.E.2d 907, 763 (W. Va. 1990) ("'Allegations of fraud,
when denied by proper pleading, must be established by clear and
convincing proof.'") (quoting Syl. Pt. 5, Calhoun Cnty. Bank v.
Ellison, 54 S.E.2d 182 (W. Va. 1949)); Liberty Lobby, 477 U.S. at
252 ("[T]he inquiry involved in a ruling on a motion for summary
judgment . . . necessarily implicates the substantive evidentiary
standard of proof that would apply at the trial on the merits.").

Additionally, "[f]raud cannot be predicated on a promise not
performed.  To make it available there must be a false assertion in
regard to some existing matter by which a party is induced to part
with his money or his property."  Gaddy Eng'g Co. v. Bowles Rice
McDavid Graff & Love, LLP, 746 S.E.2d 568, 576 (W. Va. 2013)
(emphasis in original) (quoting Syl. Pt. 3, Croston v. Emax Oil

Co., 464 S.E.2d 728 (W. Va. 1995)).  Stated differently, "the representation required, in order that there be actionable fraud, must ordinarily relate to a past or existing fact, or to an alleged past or existing fact, and not to future occurrences." Janssen v. Carolina Lumber Co., 73 S.E.2d 12, 17 (W. Va. 1952).

### 1. False Statement

It is axiomatic that fraud requires falsity.  Here, the defendants contend that the allegedly fraudulent statement was not false when made.  Before determining whether the evidence of falsity is in dispute, however, a brief discussion of gas extraction techniques and the corresponding law is helpful.

"It is well settled in West Virginia that one who owns subsurface rights to a parcel of property has the right to use the surface of the land in such a manner and with such means as would be fairly necessary for the enjoyment of the subsurface estate." Whiteman v. Chesapeake Appalachia, LLC, 873 F. Supp. 2d 767 (N.D.W. Va. 2012) (quoting Depeterdy v. Cabot Oil & Gas Corp., No. CA-97-966-2, 1999 WL 33229744, at *2 (S.D.W. Va. Sept. 13, 1999)). Exercising this right, companies may drill vertically on leased land, and horizontally up to the boundaries of non-leased land. When drilling near the boundary of non-leased property, the "rule of capture" permits companies to extract gas that migrates from beneath the non-leased land, across the boundary line, to the company's wellbore. See Energy Dev. Corp. v. Moss, 591 S.E.2d 135,

147 (W. Va. 2003) (quoting <u>Powers v. Union Drilling, Inc.</u>, 461 S.E.2d 844, 849 (W. Va. 1995)) (defining the rule of capture).

The rule of capture applies primarily in the context of expansive gas reservoirs, in which the gas easily flows to low pressure areas. In the case of the Marcellus Shale, however, the gas is locked tightly within nonporous rock. Consequently, traditional drilling methods provide insufficient means of extraction. Rather, companies utilize hydraulic fracturing by pumping fluid chemicals through the wellbore causing cracks in the rock formation and releasing trapped gas. They then inject proppants, such as sand, into the fissures to prevent them from closing.

A significant legal issue arises when the fluids or proppants traverse the boundary line into non-leased property, or when the "fracing" process creates cracks in the shale that creep into non-leased property and release a non-lessor's gas. Although the West Virginia Supreme Court of Appeals has not addressed this issue, the Supreme Court of Texas has held that "damages for drainage by hydraulic fracturing are precluded by the rule of capture." <u>Coastal Oil & Gas Corp. v. Garza Energy Trust</u>, 268 S.W.3d 1, 17 (Tex. 2008). In 2013, a court within this district rejected <u>Garza</u>'s holding based on its prediction of how West Virginia's highest court would rule. <u>Stone v. Chesapeake Appalachia, LLC</u>, No. 5:12CV102, 2013 WL 2097397, at *6 (N.D.W. Va. Apr. 10, 2013),

vacated by <u>Stone v. Chesapeake Appalachia, LLC</u>, No. 5:12CV102, 2013
WL 7863861, at *1 (N.D.W. Va. July 30, 2013). Nevertheless, West
Virginia law on this issue remains unsettled.

Here, the plaintiffs allege the Magnum landmen told them, "if
they did not execute the proffered leases, the Defendants would be
able to extract their gas from under their land and Plaintiffs
would receive no consideration therefrom." (Dkt. No. 1-1 at 24).
At the dismissal stage of these proceedings, the defendants
attacked the plaintiffs' claim for fraud in the inducement on the
ground that the allegedly false statement was not pleaded with the
particularity required by Fed. R. P. 9(b).[6] As demonstrated, the
statement, as alleged, was ambiguous because it could have alluded
to any or all of several gas extraction techniques. Moreover, if
the alleged statement did refer to one of the techniques discussed
above, the plaintiffs would have faced difficulty in establishing
the falsity element of their claim. For these reasons, the Court
was dubious about the claim's viability.

During the initial hearing in this matter, counsel for the
plaintiffs recognized this uphill battle. After treading through
the nuances of oil and gas law, he eventually represented that
"these [plaintiffs] were led to believe that [the oil and gas
companies] were going to run their laterals underneath, through

---

[6] Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party
must state with particularity the circumstances constituting fraud or
mistake."

12

their property entirely and take their oil and gas, what was a false statement, is a false statement and will always be a false statement."[7]  (Dkt. No. 93 at 75).

A wellbore that bottoms out on non-leased property is often referred to as a "deviated well," and such practice is universally illegal.  See, e.g., Garza, 268 S.W.3d at 14 ("The gas produced through a deviated well does not migrate to the wellbore from another's property; it is already on another's property."); Continental Res., Inc. v. Farrar Oil Co., 559 N.W.2d 841, 844 (N.D. 1997) (defining a "subsurface trespass" as "[t]he bottoming of a well on the land of another without his consent").  Even counsel for Belmont and Enerplus observed that "[a] lateral under your land is a trespass."  (Dkt. No. 93 at 71).

In their opposition brief on summary judgment, the plaintiffs reaffirm their theory of fraudulent inducement: "[M]ost Plaintiffs

---

[7] In fact, counsel for the plaintiffs made this representation several times throughout the hearing.  (Dkt. No. 93 at 69) ("[M]y understanding in both Stone and Garza is the laterals never went under the adjoining property owner's land and that is what the people in Preston County were led to believe by many of these landmen would happen."); id. ("So in other words, just so we're clear, that they could establish a well on an adjoining property owner's piece of property, go vertically and then laterally underneath their property and take their oil--.").  Inasmuch as the plaintiffs seek to pursue a different theory of fraudulent inducement, the doctrines of judicial estoppel and judicial admission bar such a change of course.  See Meyer v. Berkshire Life Ins. Co., 372 F.3d 261, 265 n.2 (4th Cir. 2004) (explaining that "deliberate, clear[,] and unambiguous statements made by counsel may be considered judicial admissions that bind the conceding party to the representations made") (alteration and emphasis in original) (internal quotation marks and citation omitted); Lamonds v. Gen. Motors Corp., 34 F. Supp. 2d 391 (W.D. Va. 1999).

were led to believe that if the lease was not signed the Defendants could extract their minerals through the use of 'deviant [sic] wells.'  This was a false, material representation, as this has never been the law in any jurisdiction." (Dkt. No. 115-1 at 10). Although their theory quiets any concerns regarding the falsity element of their claim, a careful review of the record establishes that the Magnum landmen told only ten of the 129 plaintiffs that the drilling company could lawfully drill a deviated well under and through their land.

Catherine Durr and Mark Carr provided a joint interrogatory response that the landman told them the gas company "could go under our land and get the gas without us knowing it and we would end up getting nothing."  (Dkt. No. 115-3 at 41).  Similarly, Allen and Donna Goff provided an interrogatory response explaining that "[w]e were led to believe that our gas could be taken even if we did not sign, by drilling horizontally under our ground."  Id. at 45. According to the response of William and Lynn Sargent, "[h]e told us that if we did not sign the lease that the company would be able to go under our land and pump from our land without our permission." Id. at 72.  The response of John W. Shaffer explained that "[h]e also stated that we might as well sign because if we

didn't they would just go under us and take the gas anyway."[8]  Id.
at 76.

During his deposition, David Friend testified that the landman
told him the drilling company "could come underneath of my property
and pull the gas right out."  (Dkt. No. 113-1 at 79; 115-3 at 138).
According to Junior Bolyard's deposition testimony, "[t]hey said,
'When they drill the well over next to you, they will just come
right under and get it.'"  (Dkt. No. 115-3 at 150).  Finally, David
Murray testified during his deposition that he was told "if we
didn't sign it, they would go under us and they would take our
mineral rights from under us."[9]  Id. at 183.

## 2. Justified Reliance

Although ten plaintiffs passed the falsity screen, a prima
facie claim for fraud in the inducement also requires clear and
convincing evidence "that plaintiff relied upon [the false

---

[8] The Court notes that the plaintiffs' answers to the defendants'
interrogatories, as contained in the record, do not comply with Fed. R.
Civ. P. 33(b)(5), which requires that "[t]he person who makes the answers
must sign them."  This raises significant doubt as to whether the Court
may consider the responses on summary judgment.  See Saria v.
Massachusetts Mut. Life Ins. Co., 228 F.R.D. 536, 539 (S.D.W. Va. 2005)
("[T]he failure to provide client verification [to interrogatory
responses] undermines the dispositive motion process under Rule 56(c).").

[9] Although Richard Bell testified during his deposition that "[t]hey
would come in underneath of you from the neighbors and get it" (dkt. no.
115-3 at 166), he clarified that he did not recall the landman saying
"anything about drilling underneath [his] land or anything like that."
Id. at 168.  Similarly, Dorsey Bolyard suggested during her deposition
that, like coal companies, gas companies "come underneath your property"
id. at 158, but she then clarified that "[the landman] didn't say how
they would take [her gas]."  Id. at 160.

representation] and was justified under the circumstances in relying upon it." Trafalgar, 567 S.E.2d at 300. The Court is not persuaded that reliance was justified in this case.

As an initial matter, the evidence of record supports the reliance element as to only four of the ten plaintiffs to whom the statement was made. David Friend testified that, "after thinking about losing my gas and getting nothing from them, I told him that I would lease to him." (Dkt. No. 113-1 at 79). According to the Sargents' interrogatory response, they "did not feel like [they] had any other option except to sign the lease" because of the statement concerning deviated wells. (Dkt. No. 115-3 at 72). Finally, David Murray testified that "[t]hey were going to take our gas anyway if we signed or not, so if they are going to take our gas anyway, we might as well get something out of it."[10] Id. at 184.

More importantly, however, none of the plaintiffs was justified in relying on such a blatant misrepresentation of the law

_____

[10] Junior Bolyard signed an affidavit swearing that "the primary reason I signed the lease in dispute is because a Magnum landman told me if I did not sign, my gas could be taken anyway." (Dkt. No. 115-3 at 191). However, Bolyard had previously testified during his deposition that he "probably would have" signed the lease even if the landman had not said anything about taking his gas. (Dkt. No. 122-1 at 3). Therefore, the Court will not credit his affidavit. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.").

16

of trespass and conversion. It is unreasonable to believe that the law would permit gas companies to drill into anyone's land and take that person's gas without his or her permission.[11] Even if one did believe that the law permits such conduct, it is even more unreasonable to believe that gas companies would spend money on leases unnecessarily. Finally, no reasonable person would accept such a representation as true and sign the lease without first looking into the validity of the statement or consulting someone knowledgeable in the oil and gas field. Thus, none of the plaintiffs was justified in signing a lease with Magnum based on the alleged statement concerning the lawfulness of deviated wells.

### 3. Statute of Limitations

Even if the plaintiffs could establish the prima facie elements of their claim for fraud in the inducement, the claim is time-barred. The Court agrees with the parties that W. Va. Code § 55-2-12 provides the applicable two-year limitations period. See Funeral Svcs. by Gregory, Inc. v. Bluefield Cmty. Hosp., 413 S.E.2d 79, 85 (W. Va. 1991), overruled on other grounds by Syl. Pt. 5, Courtney v. Courtney, 437 S.E.2d 436, 437 (W. Va. 1993). As to the accrual date, West Virginia law provides that,

> [w]here a cause of action is based on tort or on a claim of fraud, the statute of limitations does not begin to

---

[11] Even counsel for the plaintiffs acknowledged how elementary a concept this is: "I think it's oil and gas law 101 that the rule of capture never allowed somebody to go to the center through--underneath somebody's property and take the oil and gas." (Dkt. No. 93 at 70).

> run until the injured person knows, <u>or by the exercise of</u>
> <u>reasonable diligence should know</u>, of the nature of his
> injury, and determining that point in time is a question
> of fact to be answered by the jury.[12]

Syl. Pt. 3, <u>Stemple v. Dobson</u>, 400 S.E.2d 561, 562 (W. Va. 1990)
(emphasis added).  "This objective test focuses upon whether a
reasonable prudent person would have known, or by the exercise of
reasonable diligence should have known, of the elements of a
possible cause of action."  <u>Dunn v. Rockwell</u>, 689 S.E.2d 255, 265
(W. Va. 2009).

The Court has already determined that the plaintiffs exercised
<u>no</u> diligence, let alone <u>reasonable</u> diligence, by not inquiring as
to the truthfulness of the alleged misrepresentation before signing
the leases.   Moreover, the execution of the leases did not
automatically relieve the plaintiffs of their obligation to
exercise reasonable inquiry as to whether the landmen had
misrepresented the law concerning deviated wells.  Even assuming
the plaintiffs felt pressured to sign immediately, a reasonable
prudent person exercising due diligence would have consulted
someone regarding the landmen's alleged statement soon after

---

[12] The plaintiffs seize <u>Stemple</u>'s syllabus point to argue that the
Court may not determine the accrual date on summary judgment.  However,
the Fourth Circuit has rejected such an interpretation,  and has
determined that <u>Stemple</u> does not require submission of a statute of
limitations defense on undisputed facts to a jury.  <u>Childers Oil Co. v.</u>
<u>Exxon Corp.</u>, 960 F.2d 1265, 1272 (4th Cir. 1992).

signing.[13]  See Slack v. Kanawha Cnty. Hous. & Redev. Auth., 423 S.E.2d 547, 553 (W. Va. 1992) (quoting Spitler v. Dean, 436 N.W.2d 308, 311 (Wis. 1989)) ("'Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach.'").

The standard of a reasonable prudent person exercising reasonable diligence provides the limiting factor on the accrual of claims.  The plaintiffs offer no limiting principle.  Instead, they imply that their claim was timely for an indefinite period, so long as fortuity did not trigger the two-year clock.  Nonetheless,

> the law is, where one has means of knowledge of a fraud, or sufficient notice to put him on inquiry, it is enough to count time against him. . . . Where he has means of knowing or ascertaining, where he is put on inquiry, where ordinary prudence for his interests suggests that he inquire, he must do so, or else time runs.

Herold v. Barlow, 36 S.E. 8, 13 (W. Va. 1900) (internal citation omitted).

This Court concludes that, under the objective standard, the plaintiffs should have known about their claim for fraud in the inducement well before November 2010.  Because they did not file their complaint until November 2012, the claim is time-barred.

---

[13] Indisputably, some of the plaintiffs met with an attorney by August 2008, after which the attorney sent a letter to counsel for Magnum, stating "almost all my clients were induced to sign the leases, to their detriment, as a result of inaccurate representations made by Magnum employees or agents."  (Dkt. No. 111-1 at 8).

**B.   Civil Conspiracy**

In Count VII of their complaint, the plaintiffs allege that "Magnum and Belmont in causing the Defendant Landmen to come to Preston County, West Virginia, to fraudulently induce Plaintiffs to sign the oil and gas leases set forth above was done maliciously, willfully, and wantonly, and with indifference to the civil obligations affecting the rights of the Plaintiffs." (Dkt. No. 1-1 at 30).

"A civil conspiracy is not a per se, stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)."  Dunn, 689 S.E.2d at 269 (italics in original) (citing Kessel v. Leavitt, 511 S.E.2d 720, 754 (W. Va. 1998)).  "It is the tort, and each tort, not the conspiracy, that is actionable."  Id. (quoting Segall v. Hurwitz, 339 N.W.2d 333, 338 (Wis. App. 1983)).  Because the Court has dismissed the underlying tort of fraud in the inducement, the plaintiffs' claim for civil conspiracy fails as a matter of law.

Even if the claim for fraud in the inducement were otherwise viable, the plaintiffs have proffered no evidence to establish conspiracy.  West Virginia law defines a civil conspiracy as "a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not

20

in itself unlawful, by unlawful means." Syl. Pt. 8, <u>id.</u> at 258. Although the evidence establishes an arrangement between Magnum and Belmont to aggregate mineral acreage in Preston County, it does not demonstrate any concerted action by the two defendants to advise landowners that deviated wells are lawful.[14]

## C. Declaratory Relief

Before addressing the defendants' arguments opposing Count IX of the plaintiffs' complaint, the Court must determine the posture of the claim. The plaintiffs originally brought the claim under the West Virginia Uniform Declaratory Judgments Act, W. Va. Code § 55-13-1, <u>et seq.</u>, and seek a declaration from the Court that "the oil and gas leases referenced above be declared null and void due to unconscionability." (Dkt. No. 1-1 at 32). The plaintiffs also have clarified that "[their] declaratory judgment claim seeks to rescind the subject leases currently owned by the defendant, Enerplus." (Dkt. No. 117-1 at 18).

As a threshold matter, a claim for declaratory relief originally filed in state court under state law is converted to a claim under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, upon removal. <u>See</u> <u>First Nationwide Mortg. Corp. v. FISI Madison,</u>

---

[14] In an effort to save their civil conspiracy claim, the plaintiffs point to evidence suggesting that the landmen were agents of Belmont and Magnum. <u>But see</u> <u>Cook v. Heck's Inc.</u>, 342 S.E.2d 453, 460 (W. Va. 1986) ("Agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage.") (internal quotation marks and citation omitted).

LLC, 219 F. Supp. 2d 669, 672 n.1 (D. Md. 2002). Therefore, "[f]ederal standards guide the inquiry as to the propriety of declaratory relief in federal courts." White v. Nat'l Union Fire Ins. Co., 913 F.2d 165, 167 (4th Cir. 1990). The United States Supreme Court has long held that declaratory judgment is warranted only "between parties having adverse legal interests." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) (quoting Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941)).

Because Magnum and Belmont no longer hold any interest in the disputed leases, they are not adverse parties within the scope of the plaintiffs' claim for declaratory relief. See Holmes v. Chesapeake Appalachia, LLC, No. 5:11CV123, 2012 WL 3647674, at *7 (N.D.W. Va. Aug. 23, 2012) ("[B]ecause defendant Miller is not a party to the contracts which are the subjects of the declaratory judgment actions . . . she is not sufficiently 'interested' in the claims to allow the plaintiffs to assert declaratory judgment claims against her."). Therefore, the Court lacks jurisdiction to entertain a declaratory judgment claim between the plaintiffs and either Magnum or Belmont with respect to any rescission of the leases. See Powell v. McCormack, 395 U.S. 486, 512-13 (1969) ("[A] federal district court lacks jurisdiction over the subject matter . . . if it is not a 'case or controversy' within the meaning of that phrase in Art. III.").

This leaves a declaratory judgment claim for rescission against Enerplus, the current leaseholder. Enerplus contends that the Court's prior dismissal of the plaintiffs' stand-alone claim for unconscionability necessarily eliminates their claim for declaratory relief. Although the Court determined that <u>Mountain State College v. Holsinger</u>, 742 S.E.2d 94 (W. Va. 2013) precludes an independent claim for unconscionability, West Virginia does recognize unconscionability as a basis for the rescission of contracts. <u>See</u> Syl. Pt. 8, <u>Brown v. Genesis Healthcare Corp.</u>, 729 S.E.2d 217, 221 (W. Va. 2012) ("If a court, as a matter of law, finds a contract or any clause of a contract to be unconscionable, the court may refuse to enforce the contract . . . ."). Therefore, the plaintiffs' claim seeking rescission of the leases remains viable, notwithstanding the Court's prior ruling.

**1. Restoration Rule**

That said, in seeking rescission, the plaintiffs have overlooked a fundamental prerequisite:

> The rule that he who seeks equity must do equity requires that any person demanding the rescission of a contract to which he is a party must restore or offer to restore to the other party <u>whatever he may have received under the contract</u> in way of money, property, or other consideration or benefit.

<u>Nat'l Life Ins. Co. v. Hanna</u>, 7 S.E.2d 52, 54 (W. Va. 1940) (emphasis in original) (internal quotation marks and citation omitted); <u>accord</u> <u>In re APA Assessment Fee Litig.</u>, __ F.3d __, No. 13-7032, 2014 WL 4377770, at *13 (D.C. Cir. Sept. 5, 2014) ("[A]

party seeking rescission must restore the other party to that party's position at the time the contract was made.") (internal quotation marks and citation omitted); <u>Summers v. Travelers Ins. Co.</u>, 109 F.2d 845, 847 (8th Cir. 1940) (recognizing that the restoration rule "requir[es] a restoration of the status quo as a condition precedent to such rescission"). "He who would terminate or avoid a contract by [rescission] must restore everything of value he received by virtue of it." <u>Myers v. Cook</u>, 104 S.E. 593, 596 (W. Va. 1920); <u>see also Newman v. Kay</u>, 49 S.E. 926, 931 (W. Va. 1905) (discussing a case in which the cross-claim for rescission was dismissed partly because there was "no tender or offer of repayment of any money received").

Here, most of the plaintiffs received thousands of dollars in bonus payments in exchange for leasing their mineral rights to Magnum. (Dkt. No. 109-1 at 6-7). Yet they have neither pleaded nor proffered any evidence that they have returned or offered to return the money. Moreover, Enerplus represents that, "[t]o this day, Plaintiffs retain the bonus payments about which they complain." (Dkt. No. 121 at 4). From an equitable perspective, this Court would be hard-pressed to rescind the leases while permitting the plaintiffs to keep their substantial bonus payments. Thus, the plaintiffs' failure to comply with the rule of restoration precludes rescission.

**2. Unconscionability**

Notwithstanding the above, the Court will address any claim that the leases are unconscionable and that the bonus payments were unfair. In <u>Brown</u>, the West Virginia Supreme Court of Appeals set out the principles governing a court's determination of whether a contract is unconscionable. <u>See</u> Syl. Pts. 4-13, 729 S.E.2d at 220-22.

> The doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness or lop-sidedness in a contract, a court may be justified in refusing to enforce the contract as written. The concept of unconscionability must be applied in a flexible manner, taking into consideration all of the facts and circumstances of a particular case.

Syl. Pt. 4, <u>id.</u> at 220. Contracts are subject to rescission if they are "both procedurally and substantively unconscionable." Syl. Pt. 9, <u>id.</u> at 221. "Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract." Syl. Pt. 10, <u>id.</u> "Substantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party." Syl. Pt. 12, <u>id.</u> "Courts should apply a 'sliding scale' in making this determination." Syl. Pt. 9, <u>id.</u>

The plaintiffs' argument of procedural unconscionability is not entirely without support. As discussed, several of the plaintiffs have testified that, in signing leases with Magnum, they

relied on the false statement concerning trespassory deviated wells. As a result of this allegedly deceptive practice by the landmen, these several plaintiffs lacked a meaningful alternative to leasing their mineral rights. See McGinnis v. Cayton, 312 S.E.2d 765, 777 (W. Va. 1984) (listing several bases for procedural unconscionability, including "absence of meaningful choice" and "deceptive practices"). This argument, however, implicitly recognizes that Magnum was the only company offering to lease the plaintiffs' mineral rights in 2007 and 2008.[15] Thus, regardless of any deceptive statement, during the time in question, the plaintiffs had only two alternatives: either (i) refuse to lease to Magnum and earn nothing, or (ii) lease to Magnum and accept the bonus payment it offered.

Although the few plaintiffs to whom the deceptive statement allegedly was made might have held out for a better offer, that decision would have required a high degree of risk and speculation about the natural gas market. The plaintiffs' repeated assertion that they "were virtually uninformed as to the circumstances of oil and gas leasing" belies the notion that a long position on natural

---

[15] Indeed, the only evidence of higher bonus payments is hearsay. Moreover, if higher bonus payments were being offered, the leases in question would not be subject to procedural unconscionability because the plaintiffs would have had meaningful alternatives to Magnum's twenty-five dollar bonus payments.

gas constituted a "meaningful choice."[16]  (Dkt. No. 117-1 at 20).

Therefore, any procedural unconscionability was minimal and will

only suffice upon a strong showing of substantive

unconscionability.

The plaintiffs offer two primary grounds for the substantive

unconscionability of the leases.[17]  First, they argue that the one-

eighth royalty payments are unconscionable.  (Dkt. No. 1-1 at 28).

Contrary to their assertion, one-eighth royalty payments are

standard within the oil and gas industry.  See, e.g., Syl. Pt. 10,

Estate of Tawney v. Columbia Natural Res., LLC, 633 S.E.2d 22, 24

(W. Va. 2006) (recognizing that a lessor's royalty amount is

"usually 1/8").  Moreover, the West Virginia State Legislature has

placed its imprimatur on one-eighth royalty payments in the context

of issuing drilling permits.  See W. Va. Code § 22-6-8(e).

Second, the plaintiffs point to Magnum's gross profit margin

from the sale of the leases to Enerplus, and conclude accordingly

that the bonus payments they received were necessarily unfair.

This Court has no reason to believe that per se inequity results

_____

[16] The plaintiffs also suggest that the gap between their knowledge
of the industry and Magnum's knowledge of the industry amounted to
procedural unconscionability.  That knowledge gap would have existed
irrespective of the leasing company and the amounts it paid.  See Troy
Mining Corp. v. Itmann Coal Co., 346 S.E.2d 749, 754 (W. Va. 1986) ("In
most commercial transactions it may be assumed that there is some
inequality of bargaining power . . . .") (quoting Ashland Oil, Inc. v.
Donahue, 223 S.E.2d 433, 440 (W. Va. 1976)).

[17] Although the plaintiffs argue that the operational terms of the
leases are "overly harsh," the Court has no way to evaluate this argument
since the leases are not included in the record on summary judgment.

simply because a company's profits do not bear a certain proportional relationship to its purchase costs. Cf. Bennett v. Behring Corp., 466 F. Supp. 689, 698 (S.D. Fla. 1979) ("A contract, fair when entered into, does not thereafter become unconscionable simply because a great many other persons enter into identical contracts with defendant thereby increasing defendants' profits."). More importantly, the plaintiffs' ipse dixit fails to account for (i) any costs incurred by Belmont other than the bonus payments, and (ii) any value Belmont added to the group of leases it eventually sold to Enerplus.

In addition to bonus payments and other incidental costs, Belmont had to pay Magnum for its services and divest equity to Goodell, Magnum's principal. Moreover, Belmont added substantial value from Enerplus's perspective by acquiring numerous individual leaseholds that covered a vast area of continuous mineral acreage. Both of these factors account for much of Belmont's gross profit. Finally, even if other companies were paying Preston County landowners higher bonus payments during the time in question, it is altogether possible that, based on market fluctuations and other factors, those same companies earned even higher profits than did Belmont. Thus, no legally cognizable inequity resulted from the bonus payments the plaintiffs received from Magnum. See Troy Mining Corp. v. Itmann Coal Co., 346 S.E.2d 749, 753 (W. Va. 1986)

("[I]t is not the province of the judiciary to try to eliminate the inequities inevitable in a capitalist society.").

### 3. Laches

Even if the plaintiffs had a legally sustainable claim for equitable relief, it is time-barred by laches. "Laches is delay which operates prejudicially to another person's rights." Brand v. Lowther, 285 S.E.2d 474, 482 (W. Va. 1981) (citations omitted). "The equitable doctrine of laches is based upon the maxim that equity aids the vigilant and not those who slumber on their rights." Maynard v. Bd. of Educ., 357 S.E.2d 246, 253 (W. Va. 1987); see also Banker v. Banker, 474 S.E.2d 465, 477 (W. Va. 1996). Unlike a statute of limitations defense, "the controlling element of the equitable defense of laches is prejudice, rather than the amount of time which has elapsed without asserting a known right or claim." Id. Indeed, "laches is sustainable only on proof of two elements: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." West Virginia v. Abbot, 418 S.E.2d 575, 578 (W. Va. 1992) (citations omitted). "The burden of proving unreasonable delay and prejudice is upon the litigant seeking relief." Province v. Province, 473 S.E.2d 894, 905 (W. Va. 1996).

More than four years elapsed between the signing of the leases in 2007 and 2008 and the filing of the plaintiffs' complaint in 2012. Moreover, the record in this case is replete with evidence

suggesting that a reasonable prudent person who signed a lease during the time in question should have known soon thereafter that his or her bonus payment was far less than payments received by others in the community.

For instance, in September 2008, attorneys were advertising their services in connection with signing oil and gas leases. (Dkt. No. 109-1 at 11). As previously noted, some of the Preston County lessors consulted those same attorneys. Id. at 8-9. Also, in June 2008, the Preston County Journal ran an article titled "Landowners distressed with agreements."[18] Id. at 67. In August 2008, the same newspaper ran advertisements for "an informative meeting on Oil and Gas leasing."[19] Id. at 12-14. Finally, the West Virginia Surface Owners' Rights Organization hosted a meeting on August 14, 2008, and "encouraged [landowners] to attend to learn more about their rights." Id. at 15.

More telling are the plaintiffs' own deposition testimonies. For example, Gary Bowman testified that he knew someone who signed "a couple weeks after" he did and received a bonus payment of $1500 per acre. (Dkt. No. 109-1 at 51). Brad Castle testified that he knew he "could have gotten more" within weeks of signing. (Dkt. No. 109-1 at 53-55). Gordon Cathell knew "within a year" that

---

[18] Gary Conner testified that, several months after he signed, he read a newspaper article about landowners signing leases for bonus payments of up to five-thousand dollars per acre. (Dkt. No. 109-1 at 88-89).

[19] Jim Noce attended this meeting. (Dkt. No. 109-1 at 152).

"[he] didn't get a good deal for [his] oil and gas lease."[20] (Dkt. No. 109-1 at 75).

This evidence, and the rest of the record in the case, demonstrates that, even under a subjective standard, many of the plaintiffs knew of any disparity in bonus payments soon after signing leases with Magnum. See Syl. Pt. 2, Phillips v. Piney Coal & Coke Co., 44 S.E. 774, 774 (W. Va. 1903) ("A court of equity will not assist one who has slept upon his rights and shows no excuse for his laches in asserting them."). More importantly, it demonstrates that, under an objective standard, a reasonable prudent person charged with inquiry notice certainly should have known about any disparity in bonus payments shortly after 2008. See Powderidge Unit Owners Ass'n v. Highland Props., Ltd., 474 S.E.2d 872, 883 (W. Va. 1996) ("Courts, like the Deity, are frequently moved to help those who help themselves.") (internal quotation marks and citation omitted). Thus, it is clear that the plaintiffs slumbered on their rights by not filing a complaint until November 2012. See Blue v. Hazel-Atlas Glass Co., 147 S.E. 22, 25 (W. Va. 1929) ("While delay in the assertion of a right may not within itself be sufficient to defeat it, [] it does raise a presumption of intent to abandon the cause of action. Such nonaction tends to cast doubt on the existence of the right.").

---

[20] The depositions noted are representative of nearly all the plaintiffs who were deposed. (Dkt. No. 109-1 at 18, 20-21, 27, 38, 42, 44, 84-85, 99-100, 108, 126, 130, 142-43, 151, 177).

As to prejudice, Enerplus spent millions of dollars acquiring the leases from Belmont, and has been prevented from developing the leaseholds and recouping its investment because of the instant proceedings. Moreover, it is highly doubtful that Enerplus would have purchased the leases from Belmont in 2010 if the plaintiffs had filed timely lawsuits before then.

On summary judgment, Enerplus has proffered sufficient evidence to remove any dispute that the equitable defense of laches applies. Therefore, the plaintiffs' equitable claim for declaratory relief is time-barred.

### IV. CONCLUSION

The plaintiffs have not proffered sufficient evidence to support a prima facie claim for fraud in the inducement. Moreover, the claim is time-barred. Without an underlying tort claim, their claim for civil conspiracy fails as a matter of law. Also, the plaintiffs have offered no evidence to sustain a claim for civil conspiracy between Magnum and Belmont. Finally, the claim for declaratory relief seeking rescission fails because the plaintiffs failed to comply with the rule of restoration, the leases are not unconscionable, and the claim is time-barred. For these reasons, the Court **GRANTS** the defendants' motions for summary judgment.

It is so **ORDERED.**

The Court directs the Clerk to transmit copies of this Memorandum Opinion and Order to counsel of record, and to enter a separate judgment order.

DATED: October 14, 2014.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE